FILED

04/16/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

## RALPH RAY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Bradley County**
**No. 17-CR-369     Sandra Donaghy, Judge**

_____

### No. E2018-01044-CCA-R3-PC

_____

The Petitioner, Ralph Ray, appeals the Bradley County Criminal Court's denial of his petition for post-conviction relief from his 2016 conviction for second degree murder and his twenty-five-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

James F. Logan, Jr., Cleveland, Tennessee, for the appellant, Ralph Ray.

Herbert H. Slatery III, Attorney General and Reporter; Katherine Redding, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Drew Robinson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In 2014, the Petitioner was indicted for first degree felony murder and second degree murder. On September 12, 2016, the Petitioner pleaded guilty pursuant to a negotiated agreement to second degree murder and agreed to receive twenty-five years' confinement at 100% service. According to the State's recitation of the facts at the guilty plea hearing,

> Cleveland Police Department responded out to . . . a possible person being held against her will . . . . [W]hen officers arrived the subject from Apartment 9 directed them through the window to Apartment Number 7. Officers checked Apartment 7, but found no one being held against his or her will.

Approximately one hour later . . . police were again called out to Apartment 7 on the report of a stabbing. When Officers arrived they found [the victim] lying in the floor with stab wounds to his torso. He was taken to [a hospital] where he died from his injuries.

Based on the previous call involving Apartment Number 9, Officers made contact with two occupants in Apartment 9. While speaking with the two occupants Officers noticed insulation lying on the floor under the attic access. When asked if someone was in the attic, the two occupants said [the Petitioner] was hiding inside. Contact was made with the [Petitioner], and he had three outstanding warrants and . . . was taken into custody.

Detective Cody Hinson responded to the scene and interviewed Amanda Gibson who is the girlfriend of the deceased victim, and witnessed the crime. She provided a description of the subject, and it did match the [Petitioner].

[Ms. Gibson] stated she did not know the subject who had stabbed the victim. She also stated that the subject kept asking for a female when he . . . broke down the door, but she didn't know [to whom] he was referring . . . .

The two occupants of Apartment Number 9 . . . were transported to CPD to provide statements. Both occupants stated that the [Petitioner] had been staying with them for approximately three days. They stated . . . they had been asleep when he ran into their room to hide in the attic. They advised he told them not to let the Police find him. Shortly thereafter Police knocked on their door after the stabbing had occurred.

Ms. Gideon [sic] . . . picked [the Petitioner] out of a photo lineup as the person who had stabbed her boyfriend. Police then interviewed [the Petitioner] after reading him his rights. He agreed to make a statement. He stated he had been looking for his girlfriend, Whitney, for the past few days. He advised that he could hear her voice through the walls of the other apartment, that he was trying to save her. He stated he had called anonymously the first time so that the Police would find her, and we have provided all those CADs, and recordings . . . as well as all the discovery to the [defense].

[The Petitioner] [s]aid he became upset when they didn't find her. So he went to the Apartment Number 7 on his own. He stated he grabbed a long kitchen knife to take it with him. He said when the knocked on the door, the

-2-

occupants of Apartment 7 wouldn't let him in. He said he had to force his way through the door, and once inside he said he stabbed [the victim] approximately three times.

He then left apartment Number 7, went back to his apartment. He said he washed the blood off the knife in the kitchen sink and then went to hide in the attic space.

On September 14, 2017, the Petitioner filed a pro se petition for post-conviction relief, alleging the ineffective assistance of his defense attorneys because they failed to provide "law books" related to lesser included offenses of the charged offenses. On September 21, 2017, the post-conviction court entered a preliminary order stating that the petition was mailed from the Petitioner's correctional facility on September 11, 2017. The post-conviction court determined that the petition contained defects related to the date the Petitioner signed the petition and to the Petitioner's failure to sign the petition before a notary public. The court determined that the petition did not "clearly and specifically" state the grounds upon which the Petitioner relied. The court directed the Petitioner to file an amended petition by October 20, 2017.

On October 23, 2017, the Petitioner filed an amended petition for post-conviction relief, alleging that he received the ineffective assistance of counsel and that the State failed to disclose favorable evidence. The Petitioner alleged that his attorneys failed to explain the definitions of the first degree felony murder and second degree murder, that this failure resulted in his pleading guilty, although his conduct did not constitute second degree murder, and that his attorneys "were never on the same page," which resulted in the Petitioner's receiving "differing advice" and making an "uninformed and hasty plea agreement." The Petitioner alleged that, during his pretrial confinement, he was denied access to "adequate legal material" and that the State failed to provide him with definitions of the charges and the applicable lesser included offenses. The Petitioner believed the facts of his case were consistent with voluntary manslaughter and asserted that the "non-access and non-disclosure resulted in [his] guilty plea." After the appointment of post-conviction counsel, an amended petition for relief alleged the ineffective assistance of counsel and an unlawfully induced and uninformed guilty plea.

At the post-conviction hearing, the Petitioner testified that his three attorneys from the District Public Defender's Office, counsel, co-counsel, and second co-counsel, represented him during the trial court proceedings, that he did not speak to his attorneys before the date of his guilty plea hearing, and that he could not recall what, if anything, second co-counsel said to him on the day he entered his guilty plea. The Petitioner said, though, that he spoke with counsel and co-counsel before the guilty plea hearing about the sentencing hearing procedure. The Petitioner said that "they" told him the State would only extend one plea

offer, that the Petitioner could accept or reject it, and that the Petitioner would probably receive a life sentence if convicted at a trial.

The Petitioner testified that he had not heard the term felony murder previously and that he did not know what Count 1 of the indictment charged, although he knew Count 2 charged second degree murder. He denied that counsel discussed or reviewed the elements of burglary and that the discovery materials contained information about burglary. The Petitioner said that the factual basis of the offense was disputed and that he did not learn about lesser included offenses until after he was sentenced. He said that he did not know the elements of voluntary manslaughter, that none of his attorneys provided him with a copy of the statute or discussed the required mental state, and that the he was denied access to "legal law books" when he was confined at the jail.

The Petitioner testified that post-conviction counsel provided him with a transcript of the guilty plea hearing. The Petitioner agreed that the trial judge discussed second degree murder, the possibility of a life sentence, and the Petitioner's state of mind at the time of the offense. The Petitioner said that he learned about voluntary manslaughter after he began serving his sentence. The Petitioner said that, at the time of the offense, he told the police officers, and later the psychiatrists, what he thought had occurred. The Petitioner denied that counsel and co-counsel discussed the impact of his state of mind relative to lesser included offenses.

The Petitioner testified that after counsel and co-counsel told him "a few times" that his only choice was to plead guilty to second degree murder for a twenty-five-year sentence or to receive a life sentence after a conviction at a trial, he accepted the plea offer for twenty-five years because he did not want a life sentence. He said that when he made the decision to plead guilty, he knew nothing about the relevance of his state of mind.

The Petitioner testified that he did not know the people inside the apartment where the offense occurred. The Petitioner did not recall any evidence showing that the Petitioner knew them or that they knew the Petitioner. The Petitioner said that, before he went to the apartment, he believed his girlfriend had been kidnapped by "the neighbors," who were "moving her from apartment to apartment raping her." The Petitioner said that he heard someone say, "[H]e's gonna get us caught. So we're gonna either have to get her to Georgia, or kill her," and that he "freaked out and went to try to save her." The Petitioner said that before he went to the apartment to save his girlfriend, he called 9-1-1, that he asked the police to help him save his girlfriend, that the police responded to an apartment, that nobody answered the door when the police knocked, and that the police left. The Petitioner said that he had been staying at his aunt's apartment in the same complex and that he talked to the police officers through the window of his aunt's apartment.

-4-

The Petitioner testified that when he was at his aunt's apartment on the night of the incident, he had asked his girlfriend to pick him up, that he thought his girlfriend "had come to surprise" him, that he heard a woman being raped or molested through the apartment wall, and that he thought it was his girlfriend. He denied that his girlfriend ever told him to stay away from her and said that she wanted to marry him. He said that he had not seen his girlfriend in one and one-half days when he began hearing the woman being raped through the wall and that he had heard the woman for three days before the offense occurred. He said that he provided this information to the arresting police officers.

The Petitioner testified that he went to the apartment, that he "beat on" and kicked the door, that initially nobody answered, and that a man answered the door, "grabbed some kind of black object," and swung it at the Petitioner. The Petitioner said that he had a knife and stabbed the man who answered the door, that the Petitioner screamed for the man to let his girlfriend go, that the Petitioner attempted to get inside the apartment, and that the Petitioner was only attempting to save his girlfriend. The Petitioner said that he took a knife because multiple men had been in and out of the apartment and that he was afraid for himself and what was happening. He denied crossing the threshold into the apartment.

The Petitioner testified that he would not have pleaded guilty had he known his mental state at the time of the offense could have resulted in his receiving a lesser sentence. He said that he had completed the eighth grade but that he had failed the ninth grade four times. He said his mental health problems predated the offense, that he had "been off" his medication for "a good while" when the offense occurred, and that he had taken unlawful drugs three days before the offense. The Petitioner said that when the victim fell, the Petitioner "freaked out" and ran because he had outstanding arrest warrants. He said that he went to the apartment two doors down from the victim's apartment, that he washed the knife, and that he hid in the attic.

On cross-examination, the Petitioner did not recall whether counsel and co-counsel discussed the elements of felony murder. The Petitioner recalled speaking with Dr. Stephen Montgomery after his arrest but said counsel and co-counsel did not review the forensic evaluation report. The Petitioner said that he understood he had been charged with felony murder but that he only understood "it was something about aggravated burglary." He said that counsel and co-counsel reviewed the questions the trial judge would ask at the guilty plea hearing and that counsel told him how to answer these questions.

The Petitioner testified that counsel and co-counsel did not discuss involuntary intoxication. He did not recall previously admitting to medical providers that he used methamphetamine three days before the offense, although he admitted having a substance abuse problem. He denied that he was looking for methamphetamine on the night of the offense and said that he came to Cleveland with a group of people, that he did not recall the

purpose of their visit, and that "they freaked out . . . and left" because "they" thought he was a police officer. He said that afterward, he called his girlfriend, that his girlfriend said she could not pick him up immediately, that he thought she had attempted to surprise him but knocked on the wrong apartment door, and that this was "when all this stuff started happening." He said that he had been at his former girlfriend's apartment looking for his then-girlfriend and that his former girlfriend was not interviewed.

The Petitioner testified that he went to the victim's apartment because he thought his girlfriend and her children had been kidnapped and raped. The Petitioner said that the victim held the black object above the victim's head as though the victim were going to swing it at the Petitioner but that the Petitioner stabbed the victim before the victim had an opportunity to strike the Petitioner with the object. The Petitioner recalled stabbing the victim three times and running from the apartment. The Petitioner said, though, "I didn't know what I had done at the time . . . I didn't know I did that bad thing at the moment until afterwards it hit me." He said he washed the knife because he was "freaking out," and when he was asked whether he knew he had done something wrong, he responded, "Not exactly." He denied speaking with counsel about why he washed the knife and hid in the attic. He thought he threw the knife in the sink and said he hid in the attic because of his outstanding warrants, not because he knew he had done something wrong.

The Petitioner testified that counsel "more or less" told him what was contained in the Hiwassee Mental Health Center (Hiwassee) report and provided him with a copy of it. The Petitioner said that he had been treated five or six times at Hiwassee during the one and one-half years before the incident in this case. He denied that counsel reviewed those treatment records with him and said that he did not know if the records reflected that he abused narcotics. He said that he did not have the records during the trial court proceedings, that he had since received them, and that he had only reviewed about one-half of them. The Petitioner stated that he and counsel never discussed any previous problems with women and his drug abuse.

The Petitioner testified that, at the guilty plea hearing, the trial court advised him that he had been charged with first degree felony murder, that he was pleading guilty to second degree murder, and that he would serve 100% of the sentence imposed. He agreed that counsel reviewed "everything . . . in the plea" and how to answer the questions asked during the hearing and that he told the trial court he understood the rights he waived by pleading guilty. He denied understanding his answers to the trial judge's questions and said he answered the questions how he thought he was supposed to answer them in order for him to receive a twenty-five-year sentence instead of life imprisonment. He did not recall telling the trial court that he was satisfied with his attorneys and that he had good communication with them.

Co-counsel testified that his office began representing the Petitioner in general sessions court and that, at this time, the Petitioner requested a mental health evaluation. Co-counsel recalled that the evaluating psychiatrist at Hiwassee was unable to render an opinion relative to the Petitioner's competency and sanity at the time of the offense. Co-counsel said that the Petitioner underwent an in-patient evaluation at Moccasin Bend Mental Health Institute (Moccasin Bend) and that the evaluating psychiatrist determined that the Petitioner was competent to stand trial and that an insanity defense could not be supported. Co-counsel said that he learned the Petitioner had a history of mental illness, that the Petitioner signed release of records forms to obtain records from Hiwassee and Peninsula Hospital, and that co-counsel obtained those records in an effort to prepare a defense.

Co-counsel testified that he obtained the Petitioner's court records, which, along with the mental health records, showed that the Petitioner had a history of mental illness with a lack of family support, had a history of polysubstance abuse, had been on misdemeanor probation at the time of the present offense, had multiple misdemeanor convictions, including domestic abuse and theft, and had a misdemeanor probation violation pending at the time of the present offense as a result of the Petitioner's failure to appear. Co-counsel said that the Petitioner "had a pretty consistent diagnosis of bipolar disorder . . . [with] [s]ome reference to schizoaffective disorder" and had a history of noncompliance with his medication due to a lack of family support. Co-counsel said that he did not personally review the mental health records page-by-page with the Petitioner, although co-counsel reviewed the records generally and discussed with the Petitioner what co-counsel believed the records showed.

Co-counsel testified that he did not have concerns that the Petitioner could assist in his defense, although co-counsel knew the Petitioner was "seriously mentally ill." Co-counsel said the evidence showed an "irrational crime" in that the Petitioner did not know the victim and that the Petitioner believed he heard his then-girlfriend through the wall being held against her will. Co-counsel said that, based upon the Petitioner's history of mental illness, his request for an independent expert was approved and that Dr. Montgomery met with the Petitioner for approximately three hours. Dr. Montgomery's report was received as an exhibit. Co-counsel said that he reviewed generally the report with the Petitioner and advised the Petitioner that Dr. Montgomery's testimony could support an insanity defense. Co-counsel said that the report from Moccasin Bend prompted him to seek an independent expert to evaluate the Petitioner. Co-counsel said, though, that the records showed the Petitioner admitted using methamphetamine before the incident and that co-counsel was concerned the Petitioner's psychosis was induced by voluntary unlawful drug use.

Co-counsel testified that the defense did not file a notice of an intent to rely on an insanity defense and that if the case had not been resolved by the plea agreement, his next step would have been to file a notice. Co-counsel said that he provided Dr. Montgomery's

report to the prosecutor and that after the prosecutor reviewed it, the State extended a twenty-five-year plea offer for a guilty plea to second degree murder. Co-counsel said that the prosecutor believed the mental health reports mitigated the Petitioner's culpability but that the prosecutor made clear no additional offers would be extended. Co-counsel said the prosecutor also made clear that if the case went to trial, the State would seek a conviction for first degree felony murder.

Co-counsel testified that he and the Petitioner discussed possible defenses and denied that he pressured the Petitioner to plead guilty. Co-counsel said that a witness saw the stabbing, that the Petitioner was found two apartments down from where the stabbing occurred, and that the Petitioner was an addict. Co-counsel recalled that the Petitioner was not pleased with the twenty-five-year offer, that "we" discussed the offer, that nobody pressured the Petitioner to accept it, and that the time came for the Petitioner to decide whether to accept it or go to trial. Co-counsel said that, after Dr. Montgomery issued his report, the chosen defense would have been insanity had the case gone to trial. Co-counsel recalled that although he assisted counsel with the mental health portion of the defense, counsel met with the Petitioner more than co-counsel. Co-counsel said that counsel met with the Petitioner every couple of weeks and that counsel and co-counsel discussed the case after counsel met with the Petitioner. Co-counsel recalled that second co-counsel assisted with the case by meeting with the Petitioner at the jail, discussing the case with the Petitioner, corresponding by email with the prosecutor, and representing the Petitioner at the guilty plea hearing.

Co-counsel testified that he had never personally tried a case involving an insanity defense and that insanity was a difficult defense for most jurors to accept, although counsel had worked on cases in which the parties agreed a defendant had been insane legally at the time of an offense.

On cross-examination, co-counsel testified that he believed accepting the plea offer was in the Petitioner's best interest. Co-counsel did not recall telling the Petitioner he would receive life imprisonment after a trial or twenty-five years pursuant to the offer. Co-counsel said he and the Petitioner discussed lesser included offenses and the range of punishment for the charged and potential lesser included offenses. Co-counsel said he and the Petitioner discussed the elements of second degree murder to the extent that it was a knowing killing and that the State was not required to establish premeditation. Co-counsel said that they discussed voluntary manslaughter, reckless homicide, and criminally negligent homicide. Co-counsel said he and the Petitioner discussed that the ultimate goal was to obtain a conviction for something less than second degree murder but that a good outcome would have been anything less than first degree murder. Co-counsel said that he discussed the discovery materials with the Petitioner, which included evidence of voluntary drug use, and that co-counsel expressed his concern to the Petitioner that even if a jury determined the

Petitioner experienced psychosis at the time of the incident, the jury might also find that unlawful drug use induced the psychosis.

Co-counsel testified that he and the Petitioner never discussed an aggravated robbery, that the first degree murder charge was based upon the commission of an aggravated burglary, and that he and the Petitioner discussed the elements of aggravated burglary. Co-counsel believed, based upon his experience, that the trial court would have provided jury instructions for voluntary manslaughter, reckless homicide, and criminally negligent homicide and that he and the Petitioner discussed these lesser included offenses, although co-counsel did not recall providing the statutes to the Petitioner.

Co-counsel testified that the Moccasin Bend report showed that the Petitioner was delusional, which co-counsel described as "actively psychotic," and agreed that such a determination supported a conviction for a lesser included offense of first degree murder. Co-counsel knew the Petitioner was in an altered state of mind at the time of the offense but said insanity was a determination for a jury after hearing from competing experts. Co-counsel did not recall talking to the Petitioner about what questions the trial court would ask during the guilty plea hearing.

Co-counsel testified that he spoke to the woman the Petitioner identified as the Petitioner's then-girlfriend, although she was not present during the offense. Co-counsel recalled that the Petitioner was cooperative with his attorneys and that the Petitioner's version of events did not change. Co-counsel said, though, that a factual dispute existed relative to whether the Petitioner crossed the apartment threshold, that a witness said the victim was stabbed inside the apartment, and that co-counsel reviewed the crime scene photographs.

Counsel testified that his representation began in the general sessions court and that he requested the initial mental health evaluation. He said that he and the Petitioner had many discussions about this case and that although counsel could not recall the specific number of discussions, he and the Petitioner met at least once per week and sometimes two and three times per week.

Counsel testified that he and co-counsel reviewed the discovery materials with the Petitioner and that counsel answered the Petitioner's questions. Counsel recalled discussing possible defenses, including insanity, with the Petitioner. Counsel said that they discussed more than once the lesser included offenses and that he and co-counsel discussed with the Petitioner the mental state required for felony murder.

Counsel did not recall meeting with the Petitioner about the State's twenty-five-year plea offer but thought second co-counsel spoke to the Petitioner about the offer. Counsel

-9-

said that although he began this case as lead counsel, the case evolved and encompassed mental health experts and that co-counsel became involved based upon co-counsel's experience.

On cross-examination, counsel testified that he and the Petitioner discussed that the mental state required for first degree felony murder related to whether the Petitioner intended to commit a burglary, not the victim's death. Counsel said that the Petitioner's version of the events was always consistent.

Second co-counsel testified that he represented the Petitioner at the September 12, 2016 guilty plea hearing. Second co-counsel said that on August 24, 2016, he met with the Petitioner at the jail. Second co-counsel said that he communicated, when necessary, with the prosecutor and that he did not have any concerns about the Petitioner's mental state at the time of the guilty plea hearing.

On cross-examination, second co-counsel testified that on August 24, 2016, he and the Petitioner discussed "some other charges which were being considered" and the plea offer. Although second co-counsel did not recall the terms of the offer at the time of the post-conviction hearing, he said he knew the terms at the time of the August 24 meeting. His notes from the August 24 meeting were received as an exhibit. He said that his role was to explain the terms of the offer, discuss whether it was favorable, provide his opinion about it, and discuss the possibility of additional criminal charges. Second co-counsel said that after speaking with the Petitioner, he thought the Petitioner might accept the offer. An August 24, 2016 email from second co-counsel to the prosecutor was received as an exhibit and stated that second co-counsel had met with the Petitioner and discussed the case with co-counsel, that second co-counsel and co-counsel were requesting that the prosecutor hold the State's offer open in order for counsel to discuss all of the discovery materials with the Petitioner, and that the additional time might allow the parties to resolve the case.

The post-conviction court denied relief. The court credited the testimony of second co-counsel. The court discredited the Petitioner's testimony that he did not meet with second co-counsel until the day of the guilty hearing, based upon second co-counsel's testimony, the August 24 email second co-counsel sent to the prosecutor, and second co-counsel's notes from the August 24 meeting. The court found that second co-counsel was concerned about the Petitioner's understanding of the case and wanted additional time to review the discovery materials with the Petitioner. The court reviewed the guilty plea documents contained in the court file and determined that the documents reflected second co-counsel's and the Petitioner's signatures. The court said that, based upon the signatures, the logical conclusion was that second co-counsel and the Petitioner reviewed the documents and the terms of the plea agreement.

The post-conviction court also reviewed the guilty plea hearing transcript. The court determined the Petitioner understood that second degree murder required 100% service, less sentencing credits not to exceed 15%, that the Petitioner acknowledged his agreement with the terms of the plea agreement, that the trial court discussed the constitutional rights the Petitioner waived by pleading guilty, and that the Petitioner said he understood these rights. The post-conviction court determined that, during the guilty plea hearing, the Petitioner stated that he and his attorneys discussed the insanity defense and the mental health evaluations, that he understood the proceedings, and that he was competent to enter his guilty plea. The court, likewise, determined, based upon the transcript, that the Petitioner and his attorneys did not have communication difficulties and that they discussed Dr. Montgomery's conclusions "at great length." The court found that the Petitioner said that he was pleading guilty because it was better to receive a twenty-five-year sentence than a life sentence, that he and second co-counsel reviewed the plea documents, that his attorneys answered all of his questions and discussed fully the possible defenses, and that he did not think his attorneys had failed to do anything.

The post-conviction court credited the testimony of co-counsel who worked on the mental health evaluations. The court found that co-counsel discussed lesser included offenses with the Petitioner, contradicting the Petitioner's testimony. The court found, based upon the guilty plea hearing transcript, that the Petitioner understood he could take his case to trial but wanted to accept the plea offer for twenty-five years. The court found that the Petitioner's behavior on the day of the offense was "irrational[] and most likely driven by the mental illness" but that the Petitioner was competent to stand trial and was not legally insane at the time of the offense. The court determined that the Petitioner understood the guilty plea proceedings.

The post-conviction court determined that, at the guilty plea hearing, second co-counsel told the trial court that the defense disputed whether the Petitioner crossed the threshold of the victim's apartment and found that this would have been an issue of fact for a jury to determine. The post-conviction court found that the Petitioner's attorneys discussed aggravated burglary with the Petitioner, although they might not have provided the Petitioner with case law about the offense. The court credited the testimony of counsel and co-counsel that they each discussed the elements of aggravated burglary and the lesser included offenses with the Petitioner. The court also found that counsel discussed intoxication and the impact of the Petitioner's methamphetamine use on an insanity defense. The court noted that the mental health report containing information about the Petitioner's substance abuse would have been presented to a jury. The court discredited the Petitioner's testimony that he did not discuss his "drug problems" with his attorneys and that his attorneys advised him how to answer the trial court judge's questions at the guilty plea hearing. The court noted that the guilty plea hearing transcript contained more than thirty pages of discussion between the judge and the Petitioner.

-11-

The post-conviction court found that the Petitioner had previous experience with the criminal justice system based upon the Petitioner's previous misdemeanor convictions. The court found that the Petitioner's attorneys arranged for Dr. Montgomery to evaluate the Petitioner at the jail for three hours and that co-counsel intended to file a notice of the intent to present an insanity defense had the Petitioner not accepted the plea offer. The court found that the offer was extended to the Petitioner in April 2016, that the Petitioner pleaded guilty in September, and that the Petitioner had an extended period to think about the offer and to ask any questions. The court found that co-counsel met with the Petitioner frequently because of the nature of the charges and because of the Petitioner's mental health. The court determined that the Petitioner made a clear and unequivocal choice to plead guilty and that his plea was knowing and voluntary.

The post-conviction court found that although the Petitioner had an eighth-grade education, the Petitioner understood the guilty plea proceedings and the questions asked by the trial court. The court found that although the Petitioner did not have a previous felony conviction, he had been convicted of misdemeanors, had been serving a sentence on probation at the time of the present offense, and had previous knowledge of his constitutional rights. The court found, based upon the "totality of circumstances," that the Petitioner's attorneys were "competent." The court determined that the Petitioner understood what he was doing by pleading guilty and that the Petitioner's post-conviction testimony conflicted with his guilty plea hearing testimony.

The post-conviction court determined that "things could have been done better" but that the Petitioner's attorneys provided effective assistance. The court found that a particular strategy might be the best but that attorneys "have to make choices based on everything that's known to them." The court noted that "sometimes after you think about it for a while it doesn't feel as good as when you actually made the decision, and you have the threat of the trial hanging over your head." The post-conviction judge said, "I don't have to address both [*Strickland*] prongs if I feel one is not met," and determined that the Petitioner had not been prejudiced by the actions of his attorneys. This appeal followed.

The Petitioner contends that his attorneys provided ineffective assistance and that his guilty plea was unknowing, unintelligent, and involuntary. The State responds that the post-conviction court did not err by denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal,

and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## A. Ineffective Assistance of Counsel

The Petitioner contends that his attorneys (1) failed to explain "the foundational basis" of first degree felony murder, (2) failed to challenge the validity of the indictment count charging felony murder, (3) failed to investigate whether the Petitioner crossed the threshold of the victim's apartment, (4) failed to advise the Petitioner of all the potential defenses, including that the Petitioner did not commit an aggravated burglary and acted in self-defense, and (5) told the Petitioner he could either accept the twenty-five-year plea offer or receive a life sentence after a trial.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,

466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner argues that his attorneys did not explain the foundational basis of felony murder. Based upon oral argument, we interpret this as an allegation that his attorneys did not explain the elements of first degree felony murder and aggravated burglary, which was the predicate felony upon which the felony murder charge was based. The Petitioner testified on direct examination that his attorneys did not discuss the elements of these offenses. However, on cross-examination, the Petitioner testified that he did not recall whether his attorneys discussed them. The post-conviction court discredited this testimony. The court credited co-counsel's testimony that he and the Petitioner discussed the elements of first degree felony murder and aggravated burglary. Likewise, counsel's credited testimony reflects that counsel and co-counsel discussed the required mental state for first degree felony murder with the Petitioner. Counsel recalled telling the Petitioner that the mental state related to whether the Petitioner intended to commit a burglary, not the victim's death. The record supports the post-conviction court's determination that the Petitioner's attorneys did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

The Petitioner argues that the indictment count charging first degree felony murder was defective because it "set[] forth two means that the commission of the crime of aggravated burglary[.]" The Petitioner does not expound upon nor support his argument with legal authority. *See* Tenn. R. Ct. Crim. App. 10(b); T.R.A.P. 27(a). The issue was neither addressed in the post-conviction court nor at oral argument. Therefore, the Petitioner has waived appellate review because he has raised it for the first time on appeal. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). The Petitioner is not entitled to relief on this basis.

The Petitioner argues that his attorneys failed to investigate whether he crossed the apartment threshold, which was necessary in determining whether the evidence supported aggravated burglary as the basis for the felony murder conviction. Co-counsel testified that although the Petitioner's version of the events never changed, a factual dispute existed relative to whether the Petitioner entered the victim's apartment at the time of the stabbing. Co-counsel said that a witness to the killing stated that the victim was stabbed inside the victim's apartment and that the victim was found inside the apartment. The State's recitation of the facts at the guilty plea hearing supported co-counsel's credited testimony. The record supports the post-conviction court's determination that the Petitioner's attorneys did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

The Petitioner initially argues that his attorneys failed to advise him of all possible defenses, including that he acted in self-defense by attempting to save his then-girlfriend and

that he did not commit felony murder because he did not go to the victim's apartment to commit an aggravated burglary, theft, or assault. In his reply brief, the Petitioner asserts that his attorneys were ineffective because they "specifically refused to pursue his insanity defense."

The guilty plea hearing transcript reflects that the prosecutor told the trial court that the Petitioner had undergone extensive mental health evaluations and that experts had reached differing conclusions relative to the Petitioner's competency at the time of the offense. The prosecutor stated, though, that the State's position was that the Petitioner was competent at the time of the offense based upon his conduct before and after the stabbing, noting the Petitioner's washing off the blood on the knife and hiding because he knew of his outstanding arrest warrants.

At the post-conviction hearing, co-counsel testified that he obtained the Petitioner's mental health and previous court records, which showed that the Petitioner had a history of mental illness, a lack of family support, and a history of polysubstance abuse. Co-counsel generally reviewed and discussed with the Petitioner what co-counsel believed the records showed. Co-counsel knew that the Petitioner suffered from a serious mental illness and that the evidence showed the Petitioner committed an "irrational crime" because of what the Petitioner reported hearing and because the Petitioner did not know anyone inside the victim's apartment. As a result of the evidence and the Petitioner's mental health, co-counsel's request for an independent mental health evaluation was granted, and Dr. Montgomery determined that the Petitioner was insane at the time of the stabbing. Co-counsel testified that if the case had gone to trial, the chosen defense would have been insanity.

Co-counsel and the Petitioner discussed the discovery materials, which showed evidence of the Petitioner's voluntary methamphetamine use. Co-counsel told the Petitioner that even if a jury determined that the Petitioner experienced a psychosis at the time of the stabbing, co-counsel was concerned a jury might have determined that unlawful drug use induced the psychosis, which would have undermined an insanity defense. The Petitioner's testimony showed that he used methamphetamine three days before the stabbing and that he first heard what he thought was his then-girlfriend through the apartment wall three days before the stabbing. Although co-counsel believed the Petitioner's mental health at the time of the stabbing supported a conviction for a lesser included offense of first degree murder, co-counsel knew an insanity determination was a factual determination for a jury after hearing evidence from competing experts and about voluntary drug use.

Although the defense retained a favorable mental health expert, counsel testified that counsel and co-counsel discussed other possible defenses with the Petitioner. Although the prosecutor determined that the Petitioner's mental health history mitigated his culpability for

-15-

the killing, the State intended to seek a first degree murder conviction if the case proceeded to a trial. As a result, counsel, co-counsel, and the Petitioner discussed whether the Petitioner's mental state would garner a first degree felony murder conviction and whether the Petitioner intended to commit a burglary based upon the indictment. Counsel and co-counsel discussed with the Petitioner lesser included offenses and their respective required mental states. The record supports the post-conviction court's determination that the Petitioner's attorneys did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

The Petitioner argues that his attorneys gave him an ultimatum by telling him that he could either accept the twenty-five-year plea offer from the State or probably receive a life sentence after a trial and that "[b]ased upon the underlying evidence, such was just not the case." He argues that his attorneys failed to consider whether his mental health warranted a conviction for a lesser included offense. The record reflects that co-counsel requested an independent mental health evaluation to determine, at least in part, the Petitioner's mental state at the time of the offense, and Dr. Montgomery determined that the Petitioner was legally insane at the time of the stabbing. Upon providing the Petitioner's mental health records and Dr. Montgomery's report to the State in April 2016, the prosecutor extended the plea offer in which the Petitioner could plead guilty to second degree murder in exchange for twenty-five years.

Co-counsel testified that the prosecutor believed the Petitioner's mental health mitigated his culpability for the offense to second degree murder but made clear that the twenty-five-year offer was the State's only offer and that if the case proceeded to a trial, the State would seek a first degree felony murder conviction. Co-counsel discussed the offer with the Petitioner, who was not pleased with the length of sentence. Co-counsel said that nobody pressured the Petitioner to accept the offer and that the Petitioner had to decide whether to accept the offer or to proceed to trial. Although co-counsel thought accepting the offer was in the Petitioner's best interest, co-counsel denied telling the Petitioner that he would receive a life sentence after a trial. Co-counsel and the Petitioner discussed the potential lesser included offenses and sentences, and co-counsel thought, based upon the evidence, that the trial court would have provided jury instructions for voluntary manslaughter, reckless homicide, and criminally negligent homicide. Co-counsel and the Petitioner discussed that the ultimate goal was to obtain a conviction for something less than second degree murder but that a good outcome would have been anything less than first degree murder. Although the chosen defense would have been insanity, co-counsel and the Petitioner discussed co-counsel's concerns that a jury could determine that the Petitioner's psychosis was induced by the methamphetamine use before the stabbing and that a witness would testify that the Petitioner crossed the apartment threshold, which became relevant to the first degree felony murder charge. In August 2016, second co-counsel requested that the prosecutor provide the Petitioner with additional time to consider the State's offer. Second

-16-

co-counsel wanted the additional time to review the discovery materials with the Petitioner and to answer any of his remaining questions. The Petitioner entered his guilty plea the following month because he did not want a life sentence. The record supports the post-conviction court's determination that the Petitioner's attorneys did not provide ineffective assistance. The Petitioner's attorneys explained to the Petitioner the possible outcomes of the case before the Petitioner pleaded guilty, and he is not entitled to relief on this basis.

### B.     Guilty Plea

The Petitioner argues that his guilty plea was unknowingly and involuntarily entered because his attorneys did not investigate whether the Petitioner had crossed the apartment threshold. The Petitioner also argues that his guilty plea was unknowing and involuntary because his attorneys failed to review the elements of aggravated burglary, the predicate felony supporting the felony murder allegation, and failed to consider defenses other than insanity. He asserts he was compelled to plead guilty.

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that the Petitioner entered a knowing, intelligent, and voluntary guilty plea to second degree murder. The Petitioner provided the only testimony that he would not have pleaded guilty if he had known that his mental state at the time of the stabbing might have warranted a shorter sentence. However, the post-conviction court discredited his testimony. The record reflects that counsel, co-counsel, and the Petitioner discussed the discovery materials, the mental state required for a felony murder conviction based upon an aggravated burglary, the elements of the charged offenses, which included aggravated burglary, the Petitioner's mental health, possible defenses, possible lesser included offenses supported by the evidence and their respective sentences, co-counsel's concerns about a witness' placing the Petitioner inside the apartment and about the

-17-

Petitioner's voluntary methamphetamine use and its impact on a chosen defense, and his attorneys' opinions about whether the plea offer was favorable to the Petitioner.

Furthermore, the guilty plea transcript reflects that, upon questioning by the trial court, the Petitioner did not express concern about his attorneys' competence or performance and did not inform the court that he felt coerced into pleading guilty because his attorneys had given him an ultimatum of accepting twenty-five years or life imprisonment. To the contrary, the Petitioner told the court that he understood the terms and consequences of the plea agreement and the constitutional rights he waived by pleading guilty. He, likewise, understood that he waived his right to present mitigating evidence at a sentencing hearing. He said he had not taken any medication to impair his ability to understand the proceedings, that he and his attorneys had discussed his mental health, and that he was competent to enter his guilty plea. The Petitioner understood Dr. Montgomery's conclusion that the Petitioner was insane at the time of the offense, that the State's expert concluded that the Petitioner was not insane at the time of the offense, and that, ultimately, it was a question of fact for a jury to determine. The Petitioner said that after discussing the case and the plea offer with his attorneys, he determined it was better to receive a twenty-five-year sentence for a lesser included offense than to proceed to trial and face a possible life sentence. The Petitioner denied being coerced or pressured to plead guilty and said he was comfortable with his decision. He said that he was satisfied with his attorneys, that he and his attorneys had fully explored possible defenses, that he had good communication with his attorneys, and that he had no questions for the court. The Petitioner said that the State's factual recitation was "true." Second co-counsel told the trial court that in addition to resolving the murder charge in this case, the plea agreement involved the dismissal of two unrelated cases involving child pornography, aggravated burglary, and assault allegations. We conclude that the record supports the post-conviction court's determination that the Petitioner entered a knowing, intelligent, and voluntary guilty plea. The Petitioner failed to prove he is entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-18-